**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-24-00338-CR**
**NO. 09-24-00340-CR**

_____

**TINA LOUISE LOUIS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause Nos. F22-40200 and F22-40201**

**MEMORANDUM OPINION**

Appellant, Tina Louise Louis (Tina), was indicted for two counts of injury to a child, a first-degree felony punishable by five to ninety-nine years or life imprisonment.[1] *See* Tex. Penal Code Ann. § 22.04(a), (b), (e). A jury convicted Tina,

---

[1] Due to their similar surnames, we refer to Appellant, her daughter, and her daughter's boyfriend by their first names.

and the trial court sentenced Tina to two concurrent fifty-year terms of imprisonment pursuant to the jury's verdict.[2]

In five issues, Tina appeals her convictions and sentences. To support her appeals, Tina alleges that (1) the trial court omitted a proper jury instruction; (2) there was insufficient evidence to convict her of the charged offenses; (3) she received inadequate assistance of counsel because her attorney did not file a motion to transfer venue; and (4) the State made an improper closing argument during the punishment phase of the trial. We affirm the trial court's judgments.

## BACKGROUND

When he died, Tina's son, "Kevin," and two of his siblings were staying with Tina's adult daughter, Kirsten, and Kirsten's boyfriend, Jaylin, in Port Arthur.[3] When Kirsten found Kevin unresponsive one morning, she first called Tina and then called 9-1-1 for assistance. The police officers, firefighters, and emergency medical technicians who responded to the scene determined that Kevin was deceased, and

---

[2] Kirsten and Jaylin are also serving prison sentences for Kevin's death. *See Jaylin Jevon Lewis v. The State of Texas*, No. 09-24-00302-CR and No. 09-24-00303-CR, currently pending before this court.

[3] We identify the victim, his family members other than Tina and Kirsten, and civilian witnesses, by pseudonyms or family relationships to conceal their identities. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[.]"). *See Smith v. State*, No. 09-17-00081-CR, 2018 Tex. App. LEXIS 1874, at *1 n.1 (Tex. App.—Beaumont Mar. 14, 2018, no pet.) (mem. op., not designated for publication).

described his condition as "very malnourished[,]" "skin and bones[,]" and "very underweight and emaciated." Tina was charged with injury to a child for failing to provide Kevin with adequate food and medical care.

In trial cause number F22-40200, the indictment alleges Tina "did then and there, intentionally, knowingly, or recklessly, by omission, cause serious bodily injury to [Kevin], a child fourteen years of age or younger, by failing to provide adequate food to [Kevin], and the Defendant had a legal or statutory duty to act, namely, as the parent of [Kevin]."

The indictment in cause number F22-40201 reads similarly, alleging that Tina

[d]id then and there, intentionally, knowingly, or recklessly, by omission, cause serious bodily injury to [Kevin], a child fourteen years of age or younger, by failing to provide adequate medical care to [Kevin], and the Defendant had a legal or statutory duty to act, namely, as the parent of [Kevin].

We summarize below the evidence relevant to Tina's appeals.

Colleen White's Testimony

White, an occupational therapist, described her profession as working with "clients who might have a disability or an impairment, and we try to restore their activities of daily living, which means there is dressing, feeding, bathing, those kinds of things." Kevin was one of White's clients for "almost three years[,]" beginning when Kevin was four months old. White performed Kevin's therapy in his home. White's initial goal was to teach Kevin to sit up, crawl, tolerate tummy time, and

take his bottle. Later, Kevin received physical and speech therapy. When White's services stopped, in January 2021, Kevin was able to play with other children and feed himself. More specifically, White testified that Kevin could open the refrigerator and, unlike some Down Syndrome children, "was a good eater." At that time, Kevin "looked very healthy[,]" could feed himself, and was accomplishing the physical goals White had set.

"Allison's" Testimony

Allison testified that she was the oldest of Tina's eleven children, and Kevin was the youngest. When Allison first moved to Port Arthur, she lived with Tina before renting her own apartment. Allison described Kevin as a "fun loving child[,]" who was "able to walk, eat, talk[,]" and play with his older siblings. When Allison last saw Kevin, in December 2021, Kevin "was very healthy[]" and could eat anything a normal child could eat.

Kirsten's Testimony

Kirsten, Tina's daughter, testified that in May 2022, she and her then boyfriend, Jaylin, were living in Port Arthur with her youngest brother, Kevin, two of Kevin's siblings, and Jaylin's son. Kirsten explained that Kevin and his siblings were living with her and Jaylin because in December 2021, Tina "was having trouble with CPS." Kirsten testified that Tina visited them sometimes, "but she would mostly stay in Houston with her boyfriend." Kirsten estimated that during the six

4

months the children lived with her, Tina visited them "[l]ess than ten times[]" and "spoke with them "ten or less[]" times. According to Kirsten, Tina contacted the children infrequently because Tina did not want the children "to ask for her or when she was coming to get them."

While the children were living with Kirsten, she told Tina that Kevin had health problems. Specifically, Kirsten testified that she told Tina that there was a strong smell when Kevin urinated, and that Kevin did not want to eat and had trouble chewing. Tina responded that Kirsten should get Kevin canned formula and vitamins. Kirsten also told Tina about the seizure Kevin had eleven days before he died, but Tina made no effort to obtain medical attention for Kevin at that time.

Kirsten testified that it was Jaylin who put Kevin in the closet. Kirsten further testified that it was Jaylin who installed the lock on the closet door, but she later averred that she "never seen that padlock[]" and did not know it was there. Kirsten's text messages to Jaylin show that she was asking Jaylin to "take [Kevin] out of the closet, please." Kirsten and Jaylin exchanged text messages about Kevin having seizures, and Jaylin stated he had "been doing CPR for 20 [expletive] minutes." Kirsten and Jaylin were able to cool Kevin and get his seizures under control, but they never called for medical assistance for Kevin until after Kevin had died.

Kirsten also acknowledged having told Tina on May 27, four days before Kevin died, that Tina did not "have to worry[]" about Kevin. Three days before

Kevin's death, Kirsten further reassured Tina that Kevin and his siblings were doing well and eating fruit. Kirsten admitted that there was food in her apartment, as evidenced by the pizza boxes and other food wrappers shown in the photographs but claimed that Kevin sometimes refused to eat.

The day Kirsten called 9-1-1, she also spoke with Tina, who told Kirsten to lie to the police and tell them that Kevin had stayed at Kirsten's residence for the weekend only, and Kirsten may have done so.

Kirsten pleaded guilty to intentionally omitting the food and medical care Kevin needed and was sentenced to thirty years in the Texas Department of Criminal Justice. Kirsten also testified at Jaylin's trial. Jaylin was convicted of the charges against him and sentenced to sixty years in the Texas Department of Criminal Justice.

Father's Testimony

Tina's estranged husband testified that he and Tina had three children together, including Kevin. Although Kevin had Down Syndrome, it did not prevent him from eating. Father testified that he paid child support.

Father testified that he last saw his three children when he returned them to Tina after Thanksgiving 2021. At that time, Kevin was "in pretty good health. He was eating and everything." Sometime after Thanksgiving, Tina became angry with

6

Father, telling him he "would never see [the children] again." Although Father tried to locate the children, he was unsuccessful.

Father did not know that anything was amiss until the morning of May 31, 2022, when he received a telephone call to let him know that Kevin "was unresponsive and stuff like that." Father then "jumped up and got dressed to come to Texas[,]" but while he was on the way, he heard that Kevin had died.

"Tony's" Testimony

Tony testified that in May 2022, he and Tina were in a dating relationship for about five and one-half months, and that they were living together in Pearland. Tina had told Tony that she was divorced. Although Tina had a vehicle at their residence, she never brought Kevin or his two siblings to visit there. Tony recalled that on May 31, 2022, Kirsten called Tina to let her know that "something was wrong with her – one of her babies[,]" so Tony drove Tina to Port Arthur. During the drive, Tina "got the call that he [had] passed away."

James Barbay's Testimony

Barbay testified that he was a captain with the Port Arthur Fire Department and outlined his training and experience in that field. Barbay recalled that on the morning of May 31, 2022, he responded to a call of "a child not breathing." When Barbay arrived at the scene, a young woman met him and stated that "her mom had left the child[.]" The young woman then directed Barbay to a room where a young

7

man was "doing CPR on a small child." Barbay quickly assessed the child "to see if he had a pulse. There was no pulse. The child wasn't breathing[.]" Barbay further described the child as "[s]mall" and "very malnutritious[,]" noting that "[y]ou could see the skeletal structure on the child." Although first responders administered life-saving efforts, they were unsuccessful.

While others were treating the child, Barbay tried to "[f]ind out what's going on." Barbay therefore asked the young woman

> [H]ow long – because she was very adamant that it was her mother's fault and her mother hasn't been taking care of the child. And when I asked her how long it was – it's been since her mother had been there, she had told me it was – it was an extended period of time.

Although Barbay could not "recall exactly what the time frame was[,] it was "clear" to him that it would take some time for a child to reach that state.

Kayla Taylor's Testimony

Taylor testified that in May 2022, she worked as a supervisor with Acadian Ambulance and outlined her education and training as a paramedic. Early on the morning of May 31, 2022, Taylor responded to a call, and while she and her colleagues were in route to the location, they were advised that they were responding to a cardiac arrest, meaning that a person is not breathing, and his heart is not beating.

Upon arriving at the scene, Taylor saw "several members from the fire department and the police that were surrounding the patient. One of the fire department personnel were doing CPR on [Kevin] at the time." Taylor assessed

8

Kevin and found that he had no heartbeat and was not breathing. She also observed that Kevin "had some rigor mortis to his jaw, and he was very underweight and emaciated." Taylor explained rigor mortis as "stiffening of the muscles that occurs within the first couple of hours after someone has" died. Given her findings, Taylor advised personnel to discontinue resuscitation efforts, since Kevin "was beyond help."

Taylor estimated Kevin as being about three years old and observed that Kevin was very dirty.[4] When asked about the closet and its contents, Taylor stated that there was a padlock on the door frame. When Taylor first noticed the padlock, it was locked. After the officers at the scene opened the closet by force, Taylor saw that it contained a soiled blanket and a pillow on the floor, a television screen, and a baby bottle.

Bao Tran's Testimony

Tran, a Port Arthur police officer, testified that he was dispatched to the scene on May 31, 2022, to assist another agency. When Tran arrived, he saw "firefighter personnel attempting to resuscitate a child." Tran could see that the child "was very malnourished . . . and that his rib cage . . . was very visible."

While Tran's body camera recording was being played for the jury, Tran testified to the recording's content. The recording depicts Kirsten stating that she

---

[4] According to the autopsy report, Kevin was four years old when he died.

told Tina to take Kevin to the doctor, and also shows officers forcing open the closet door, where Tran noted the same items Taylor described. Tran further noted that another door in the room had been screwed shut, and that two children, Kevin's siblings, were on the other side of the door.

Tammie Engle's Testimony

Engle, a patrol officer with the Port Arthur Police Department, testified that on the morning of May 31, 2022, she was dispatched on a call of a nonresponsive child. When she arrived at the scene, Engle saw "a bunch of paramedics and firemen around a small, nonresponsive child." Engle noticed that the child "was very small for his age."

As Engle's body camera recording was playing, Engle testified to the statements being said and added that Kirsten explained that the children were living there because her "mother had a CPS [Child Protective Services] case, and the mother was trying to hide the children from CPS."

Mickey Sterling's Testimony

Sterling, a retired Port Arthur police officer, testified that he was on duty on May 31, 2022. Like his colleagues, Sterling was called out due to a report of a nonresponsive baby. Referring to his body camera recordings, Sterling testified to Kirsten's statements that Kevin had Down Syndrome and that she had told Tina of Kevin's eating problems. Sterling testified that he was the one who forced open the

10

padlocked closed door and confirmed the others' testimony about the closet's contents. Sterling further confirmed the trash in the apartment, agreeing that it was pretty filthy.

Lakeisha Thomas' Testimony

Thomas, a detective with the Port Arthur Police Department, testified that she interviewed Tina in connection with the investigation into Kevin's death. Thomas also interviewed Father and Tony. Thomas' interview of Tina was recorded, and the recording was played for the jury.

According to Thomas, Tina stated during the interview that Kevin stayed with Kirsten only on weekends, but Thomas later learned that Kevin had been staying there "[f]or some months." Tina further told Thomas that the children split their time between her own house and Father's house, but Thomas learned that this statement was inaccurate. In addition, Tina stated that she last saw Kevin in late March, about two months before he died. Thomas also recalled that Tina was crying during the interview.

Dr. Miguel Laboy's Testimony

Miguel Laboy, M.D., with Forensic Medical Management Services, outlined his education and experience as a forensic pathologist. Laboy estimated that he has performed about 6,000 autopsies in his life, and described the procedure for doing so, noting that it begins with removing and documenting clothing and therapeutic

11

intervention. He would then do an external examination of the body, noting any tattoos, surgical scars, and injuries. Depending on the situation, Laboy may take x-rays of the body to identify old or recent fractures or other trauma.

Dr. Danielle Armstrong, who was with Forensic Medical Management Services at that time, performed Kevin's autopsy on June 3, 2022. According to Laboy, Armstrong performed the autopsy "with the normal protocols from the National Association of Medical Examiners." Since Armstrong was no longer affiliated with Forensic Medical Management by the time of trial, Laboy testified from Armstrong's report. Laboy agreed with Armstrong's findings that Kevin's death was due to malnutrition and bronchopneumonia and that Kevin's manner of death was homicide. Laboy further stated that Kevin's level of malnutrition would take time, would not happen overnight, and would be obvious to anyone who saw Kevin. Laboy also agreed that failure to provide someone with adequate food or medical care could be fatal, and that death is a serious bodily injury.

Laboy explained the autopsy photographs admitted into evidence, noting that these photographs showed Kevin's sunken cheeks and eyes, atrophied muscle, and maggots in Kevin's groin area.

<u>Additional Evidence</u>

<u>Kirsten's 9-1-1 Call</u>

In her May 31 call, Kirsten states that her three-year-old brother is not breathing and "I keep telling my mom he's sick." The 9-1-1 operator then tells Kirsten to place Kevin on the floor to perform CPR, but the call disconnected.

<u>Officer Tran's Body Camera Recording</u>

This recording shows Tran ascending the stairs to Kirsten's second-floor apartment. As Tran arrives, Kirsten is heard telling another officer that her mother "keeps leaving him" and that "she acts like everything I tell [her] about him – I tell her he got bladder problems," her mother responds that she gives Kevin vitamins. Kirsten also states that Kevin "is supposed to be in therapy – and doctors – all that – he don't even know how to talk." Kirsten further states that she told her mother "something was wrong with him . . . like he didn't want to chew no food." Kirsten then responds to a question from another first responder stating, "last night when we went to bed, he was good."

When Tran asks Kirsten to provide "a rundown on what happened this morning," Kirsten replies that Kevin slept in the bed with her and her boyfriend. After they woke Kevin and tried to give him something to drink, "his jaw like locked . . . and he wasn't moving." A few minutes later, Kirsten states that she told her mother to "take this baby to the doctor, put him in therapy, and all that you not doing,

13

what you supposed to do." She continues, saying, "I been telling my mama about this for a long time." When an officer asks Kirsten "How'd that baby starve to death?" Kirsten replies, "he didn't starve to death," and the officer states, "he's nothing but skin and bones." Kirsten then states

> [H]e didn't want to eat nothing. I keep telling my mama that. She said I give him toddler milk because he don't want to chew nothing, like if you give him hard stuff like chicken and stuff, he'll choke on it.[5] He don't want to chew it like, and I told her he needs to be in therapy.

Later, Kirsten can be heard saying that she told her mother that, "when [Kevin] pees, it's a loud smell, and every time he drinks his milk it's a loud smell . . . and he grinds his teeth," but her mother responds that "it's normal" because "she don't want to put up with it. She wants other people to put up with it." Kirsten later states that she told her mother that Kevin's weight "was going up and down," but Tina said it was normal for Kevin's weight to fluctuate, and that Kirsten should give Kevin vitamins and milk. Kirsten stated that when she told her mother Kevin needed to go to the doctor, her mother was "stalling and stuff."

Later in the recording, officers are heard forcing open the padlocked closet and mentioning the "bottle" inside it. Eventually, the recording reflects an officer repeating Kirsten's statement that Kevin did not want to eat, and another officer states, "there's alternatives if you bring 'em to a doctor." The officers, in describing

---

[5] In Tina's interview, she clarifies the phrase "toddler milk" as meaning formula, specifically mentioning Enfamil for toddlers.

Kevin's condition, reference "skin wrapped around his skull," and "look at his eyes sunk in," while another voice mentions "Jews during the Holocaust."

When Tina arrives at the scene, and is told that Kevin passed away, an officer instructs her to go to the police station so that she can provide information such as Kevin's medical history.

Officer Engle's Body Camera Recording

This recording shows attempts to resuscitate Kevin. The recording later captures Detective Jaquez speaking with Kirsten, and Kirsten stating that Kevin was three years old, had been living with her "for like a week now," . . . because CPS is on my mom's case so she brung him to me to try to hide him." Kirsten then clarifies that Tina brought all three of Kirsten's youngest siblings to live with Kirsten for the same reason and admits that Kevin had been staying with her for four months. Kirsten later states that she told Tina Kevin did not want to chew. According to Kirsten, Tina responded to the report of Kevin's eating difficulties by telling Kirsten to give him vitamins and milk. Kirsten states that Tina "brung the vitamins here and say oh, just give this to him." Kirsten also states that Kevin was supposed to be in therapy but stopped going to therapy "when my mama took them away from their daddy."

When Detective Jaquez asks whether Kirsten "ever tried calling EMS to come check on [Kevin] if he got really bad," Kirsten responds that "he didn't get really

15

bad." In response to Jaquez asking, "when's the last time you saw him that he was okay," Kirsten says, "last night, before we went to sleep, he was drinking juice and stuff." Kirsten then tells Jaquez, as she told Tran, that when they woke that morning, they tried to give Kevin some juice, but Kevin was not moving. Kirsten then states that she called Tina, who told her to call 9-1-1.

Officer Sterling's Body Camera Recording

In addition to duplicating some content from Tran's and Engle's body camera recordings, Sterling's recording includes Sterling describing Kevin's "starved" condition and further includes Kirsten's explanation of Tina's behavior vis-à-vis the three youngest children. Specifically, Kirsten tells Sterling that Father was looking for the three children, as was CPS. Kirsten also tells Sterling that Tina "put them [the children] on everybody else." Referring to Kevin's two older siblings staying with Kirsten, Kirsten states, "I didn't want to give them back to my mom because she was going to drop them off on the next person." Kirsten then states that although Father tried to place the two older children in school, Tina "keeps them away, she just keeps the child support money." Kirsten also related a time when she told Tina that Kevin's weight was "dropping," and Tina responded that it was normal for Kevin's weight to "go up and down."

Later in the recording, Kirsten is seen crying, stating, "their daddy on the phone he keep saying the same thing, she's been doing this for years." Kirsten then

16

tells Sterling, "I tell my mama all the time – 'you can't abandon your kids.'" As Sterling tries to calm Kirsten, she states, "[y]ou don't understand how many times I told her 'this child needs therapy' and everything."

Tina's Interview

After *Mirandizing* Tina, ensuring Tina's understanding of her rights, and obtaining Tina's agreement to speak with law enforcement, Detective Thomas interviewed Tina at the Port Arthur Police Department on the day Kevin died. Tina stated that she protected her children and did everything she could for Kevin, including giving him vitamins and keeping him away from the public because of Covid and Kevin's weak immune system. She stated that Kirsten kept her three youngest children from time to time, and that she dropped off the children with Kirsten approximately the Thursday before Kevin died. According to Tina, it was normal for Kevin's weight to fluctuate, and she would know within a day or two if his weight dropped because it would show in his face. She further stated that Kevin's appearance during their video calls, including a call a day or two before Kevin died, indicated to her that Kevin was doing normally. Tina also stated that she sent Kirsten money to cover the children's needs. Tina acknowledged that caring for Kevin was more difficult than caring for a child without Down Syndrome.

17

Tina admitted that Kirsten told her Kevin did not want to eat, but she attributed Kevin's death to illness, saying it "had to be his immune system," "somebody had to be sick," and "somebody had to catch a cold, or something."

Autopsy Report

Dr. Armstrong's report of Kevin's June 3, 2022, autopsy reflects that Kevin was four years old, was thirty-five and one-half inches long, and weighed nineteen pounds, a body weight less than the fifth percentile. Armstrong noted the following signs of malnutrition: (1) atrophied skeletal muscle; (2) sunken ocular globes; (3) decreased buccal and abnormal adipose tissue; and (4) protruding ribs, vertebrae, and iliac crests, in addition to "[a]cute bronchopneumonia." Armstrong further documented multiple abrasions and maggots in Kevin's genital region. She listed the cause of Kevin's death as "[s]evere malnutrition with acute bronchopneumonia[,]" and his manner of death as homicide.

**STANDARD OF REVIEW AND ANALYSIS**

Issues Two and Three: Sufficiency of the Evidence

Because the disposition of these issues could result in a disposition of the case, we shall consider Tina's second and third appellate issues first. Tina argues that the evidence adduced at trial was insufficient to convict Tina of the offenses charged, since the evidence did not show that "she had care, custody or control" sufficient to subject her to criminal liability.

In evaluating sufficiency of the evidence to prove the charged offense, we view all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). Under the *Jackson* standard, we defer to the jury's responsibility to fairly resolve conflicting testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *See Metcalf*, 597 S.W.3d at 855; *Hooper*, 214 S.W.3d at 13, 16–17. The jury as factfinder is the sole judge of the weight of the evidence and witnesses' credibility, and it may believe all, some, or none of the testimony presented by the parties. *Metcalf*, 597 S.W.3d at 855 (citations omitted). We do not reweigh the evidence or determine the credibility of the evidence, nor do we substitute our judgment for the factfinder's. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citation omitted); *see also McPherson v. State*, 677 S.W.3d 663, 664 (Tex. Crim. App. 2023). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted).

A person commits the offense of injury to a child if she:

19

(a) intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, elderly individual, or disabled individual:

(1) serious bodily injury;

(2) serious mental deficiency, impairment, or injury; or

(3) bodily injury.

. . .

(b) An omission that causes a condition described by Subsection (a)(1), (2), or (3) or (a-1)(1), (2), or (3) is conduct constituting an offense under this section if:

(1) the actor has a legal or statutory duty to act: or

(2) the actor has assumed care, custody, or control of a child, elderly individual, or disabled individual.

(c) In this section:

(1) "Child" means a person 14 years of age or younger.

. . .

Tex. Penal Code Ann. § 22.04(a), (b), (c). A parent of a child has "the duty to support the child, including providing the child with clothing, food, shelter, medical and dental care, and education[.]" Tex. Fam. Code Ann. § 151.001(a)(3). This duty continues "while the child is an unemancipated minor[.]" *Id.* at (b).

Injury to a child is a result-oriented offense, requiring a mental state that relates not to the charged conduct but to the result of the conduct. *See Alvarado v. State*, 704 S.W.2d 36, 38 (Tex. Crim. App. 1985). It is not enough for the State to

prove that the defendant engaged in the alleged conduct with the requisite criminal intent. *Lee v. State*, 21 S.W.3d 532, 540 (Tex. App.—Tyler 2000, pet. ref'd). "The State must also prove that the defendant caused the result with the requisite criminal intent." *Id.* (citing *Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994)). A person intends the result of her conduct when it is her "conscious objective or desire to engage in the conduct or cause the result." Tex. Penal Code Ann. § 6.03(a). A person acts knowingly "with respect to a result of [her] conduct when [s]he is aware that [her] conduct is reasonably certain to cause the result." *Id.* § 6.03(b). The jury may infer intent from the defendant's acts and words as well as the surrounding circumstances. *See Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984).

Tina does not dispute that Kevin was under fourteen years old or that he sustained a serious bodily injury. *See* Tex. Penal Code Ann. §§ 1.07(46) (defining "[s]erious bodily injury" as including death); 22.04(c). Tina's challenge to the sufficiency of the evidence argues that it was Kirsten and Jaylin, not Tina, who were responsible for Kevin's death due to lack of food and medical care. Tina argues that there was insufficient evidence of her "requisite mental state[]" or that she "intended or could have foreseen the death of her child." The record contains evidence that Kirsten reassured Tina that Kevin was doing well, and Tina need not worry about him. The record also shows Tina saying she did everything possible to protect her children and crying over Kevin's death. The jury therefore could have inferred that

21

Tina knew nothing of Kevin's condition and neither intentionally nor knowingly allowed him to be harmed. The jury, however, need not have credited the evidence of Tina's good intentions. *See Metcalf*, 597 S.W.3d at 855. Instead, the jury could have credited Kirsten's statements to law enforcement personnel and believed that Kirsten told Tina that Kevin had a seizure, was not eating, was losing weight, and needed therapy and medical care, but Tina disregarded Kirsten's concerns. *See id.* Based on this evidence, the jury reasonably could have inferred that Tina knowingly disregarded Kevin's needs, since she disregarded those needs after Kirsten brought them to Tina's attention. Such disregard fits the statutory definition of "knowingly[.]" Tex. Penal Code Ann. § 6.03(b); *see Proo v. State*, 587 S.W.3d 789, 810 (Tex. App.—San Antonio 2019, pet. ref'd) ("'knowingly' causing the child's injury requires evidence that the defendant was aware with reasonable certainty that the result of serious bodily injury/death would have been prevented had the defendant performed the act that was omitted.") (citation omitted). Here, as in *Proo*, "the testimony and medical evidence established that [Kevin] had obvious and apparent emaciation and physical injuries that the jury could reasonable infer" Tina would have noticed during the video calls she allegedly had with Kirsten and Kevin. 587 S.W.3d at 810. "Eyewitness testimony concerning a child's appearance can provide evidence of the extent of a defendant's awareness and knowledge of the child's condition and need for medical care." *Id.* at 811. Since multiple first

22

responders testified that Kevin was "skin and bones," Tina also must have appreciated Kevin's dire state when she allegedly saw him during a video call only a few days before he died. *See id.* at 812 (referencing testimony and photographs of the deceased's condition).

If, conversely, the jury believed that Tina's statements to law enforcement were false, the jury could have interpreted Tina's statements as evidence that Tina did, in fact, "intentionally or knowingly" cause Kevin serious bodily injury by omission. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt.") (citation omitted); *see also Comeaux v. State*, 413 S.W.3d 176, 187 (Tex. App.—Beaumont 2013), aff'd, 445 S.W.3d 745 (Tex. Crim. App. 2014) (same).

Regardless of whether the jury believed Kirsten, disbelieved Tina, or both, the evidence is sufficient to support the jury's verdict as to both food and medical care. We overrule Tina's second and third issues.

Issue One: Jury Instruction

In her first issue, Tina contends that the trial court erred by omitting a jury instruction addressing concurrent causation. She posits that she was entitled to such

an instruction because Kirsten's and Jaylin's acts or omissions alone were sufficient to cause Kevin's death.

Appellate review of a purported jury charge error involves a two-step process. *See Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *Barron v. State*, 353 S.W.3d 879, 883 (Tex. Crim. App. 2011). First, we must determine whether error exists, and second, we must determine whether sufficient harm resulted from the error to warrant reversal. *See Barron*, 353 S.W.3d at 883 (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)); *see also Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). If no error occurred, our analysis ends. *See Kirsch*, 357 S.W.3d at 649. Whether the error was preserved in the trial court determines the degree of harm required for reversal on appeal. *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016); *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) (citing *Almanza*, 686 S.W.2d at 171). If error was preserved by objection at trial, to obtain a reversal it requires a showing of "'some harm[.]'" *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013) (quoting *Almanza*, 686 S.W.2d at 171). If the error was not preserved by objection at trial, to obtain a reversal it requires proof of fundamental harm that was "so egregious and created such harm that the defendant was deprived of a fair and impartial trial." *Villarreal*, 453 S.W.3d at 433.

In assessing the degree of harm, we must consider the entire jury charge, the evidence, the argument of counsel, and any other relevant information revealed by the record. *Almanza*, 686 S.W.2d at 171. We examine the charge in its entirety rather than a series of isolated statements. *Holley v. State*, 766 S.W.2d 254, 256 (Tex. Crim. App. 1989); *Iniguez v. State*, 835 S.W.2d 167, 170 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd). "'[E]gregious harm is a difficult standard to prove and such a determination must be done on a case-by-case basis.'" *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011) (quoting *Hutch v. State*, 922 S.W.2d 166, 172 (Tex. Crim. App. 1996)). "Errors which result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Id.* at 490.

The Texas Penal Code addresses concurrent causation, stating that "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." Tex. Penal Code Ann. § 6.04(a). An act includes an omission when there is a duty to act. *See Cyr v. State*, 665 S.W.3d 551, 556 (Tex. Crim. App. 2022); Tex. Penal Code Ann. § 22.04(b).

"The trial court must provide the jury with 'a written charge distinctly setting forth the law applicable to the case.'" *Maciel v. State*, 631 S.W.3d 720, 722 (Tex. Crim. App. 2021) (quoting *Walters v. State*, 247 S.W.3d 204, 208 (Tex. Crim. App. 2007); Tex. Code Crim. Proc. Ann. art. 36.14)). An unrequested defensive issue, however, "is not the law 'applicable to the case.'" *Vega*, 394 S.W.3d at 519 (quoting *Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998)). Therefore, a trial court has no duty to instruct the jury on a defensive issue that the defendant did not request, and "[a] defendant cannot complain on appeal about the trial judge's failure to include a defensive instruction that he did not preserve by request or objection: he has procedurally defaulted any such complaint." *Vega*, 394 S.W.3d at 519.

In *Posey*, the Texas Court of Criminal Appeals considered and rejected a similar argument, stating:

> [C]onsistent with general rules of procedural default as well as the policies expressed in other portions of the statutory provisions referenced in Article 36.19, we decide a defensive issue is not "applicable to the case" for purposes of Article 36.14 unless the defendant timely requests the issue or objects to the omission of the issue in the jury charge.

966 S.W.2d at 62.

The Court recently reaffirmed the principle that a party who does not request a jury issue on a defensive issue will forfeit his right to that instruction. *See Cruz v. State*, 698 S.W.3d 265, 268 (Tex. Crim. App. 2024). *Cruz* references the three categories of error preservation rules set forth in *Marin v. State*, and states that

26

instructing a jury on a defensive issue falls in the third category: error is forfeited absent a proper request or objection. *Cruz*, 698 S.W.3d at 268; *Marin*, 851 S.W.2d 275, 279 (Tex. Crim. App. 1993).

Applying the above standards to Tina's initial appellate issue, we observe that, as Tina acknowledges in her brief, concurrent causation is a defensive issue. The record does not reflect that Tina requested that a jury instruction on concurrent causation be included in the charge. Moreover, the record shows that Tina did not object to the absence of such an instruction. Therefore, according to the rationale of *Vega*, the trial court did not err because it bore no responsibility to instruct the jury on an unrequested defensive issue on its own motion. 394 S.W.3d at 519.

Since the trial court did not err by omitting a concurrent causation instruction from the jury charge, we need not address the second prong of the analysis. *See Kirsch*, 357 S.W.3d at 649. We overrule Tina's first issue in both cases.

Issue Four: Assistance of Counsel

Tina next argues that her appointed trial counsel erred by failing to move for a change of venue. She alleges that this omission cost her a fair trial due to the media exposure in these cases. We construe this issue as Tina's claim that she was denied effective assistance of counsel. *See* U.S. CONST. amend. VI.

"Evaluating claims of ineffective assistance of counsel under the Sixth Amendment involves a two-pronged test: (1) whether counsel was deficient, and (2)

whether the defendant suffered prejudice as a result of counsel's error." *Hart v. State*, 667 S.W.3d 774, 781 (Tex. Crim. App. 2023) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To establish counsel's deficient performance, an appellant must show by a preponderance of evidence that counsel's actions fell below an objective standard of reasonableness. *Id.*; *see also Strickland*, 466 U.S. at 687–88. "Under *Strickland*, the defendant must prove, by a preponderance of the evidence, that there is, in fact, no plausible professional reason for a specific act or omission." *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). Our review of counsel's performance is highly deferential, and we presume he provided reasonable assistance. *See id.* at 833. We afford counsel a strong presumption that his conduct falls within a wide range of reasonable professional assistance, and a defendant must overcome this presumption that the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689; *Hart*, 667 S.W.3d at 781; *Johnson v. State*, 624 S.W.3d 579, 586 (Tex. Crim. App. 2021) (citation omitted). To overcome this presumption, "'[a]ny allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness.'" *Tanner v. State*, 707 S.W.3d 371, 377 (Tex. Crim. App. 2024) (citation omitted); *see also Johnson*, 624 S.W.3d at 586; *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999).

"Under most circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decision-making as to overcome the strong presumption that counsel's conduct was reasonable and professional." *Scheanette v. State*, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004); *see also Hart*, 667 S.W.3d at 782. Ordinarily, trial counsel should be given an opportunity to explain his conduct before being considered ineffective. *Hart*, 667 S.W.3d at 782. Without this explanation, and faced with an undeveloped record on direct appeal, we "'commonly assume a strategic motive if any can be imagined and find counsel's performance deficient only if the conduct was so outrageous that no competent attorney would have engaged in it.'" *Id.* (quoting *Okonkwo v. State*, 398 S.W.3d 689, 693 (Tex. Crim. App. 2013)). We will consider counsel's actions deficient only if we find no reasonable trial strategy could justify counsel's acts or omissions, regardless of counsel's subjective reasoning. *See id.* (quoting *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011)).

The record does not indicate that Tina filed a motion for new trial alleging ineffective assistance, and the record is undeveloped regarding counsel's trial strategy and decisions. *See Graves v. State*, 310 S.W.3d 924, 929 (Tex. App.—Beaumont 2010, pet. ref'd). With no opportunity for trial counsel to explain his actions, we assume he had a strategic reason for his decisions. *See Hart*, 667 S.W.3d

29

at 782. In addition, trial counsel's ineffectiveness is not apparent from the record. *See Freeman v. State*, 125 S.W.3d 505, 506–07 (Tex. Crim. App. 2003).

Tina has not defeated the strong presumption that counsel's decisions during the trial fell within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Hart*, 667 S.W.3d at 782. We find nothing in the record showing that trial counsel's decisions were so outrageous that no competent attorney would have engaged in them, and we hold that Tina failed to establish that trial counsel's performance was deficient. *See Strickland*, 466 U.S. at 687–88; *Hart*, 667 S.W.3d at 781–82, 784. We overrule Tina's fifth issue in both cases.

Issue Five: Improper Argument

In her final issue, Tina argues that the State "presented improper closing arguments during" the punishment phase of the trial. The State's purportedly improper argument consists of reading a portion of the court's charge, stating:

> It says while there's no guarantees[,] whatever number you give her, after half---serving half of that time, there is a possibility --- a very real possibility that she would be eligible for parole, okay? So whatever number you give her there is that possibility that after serving half of that time, she'll be eligible for parole.

Defendant did not object to this argument but now claims that it was improper because it "instruct[ed] the jury that when assessing time, you need to consider or keep in mind she will be eligible and be released in half the time." To preserve error, the complaining party generally must "demonstrate that [s]he lodged a timely

30

objection to the matter sufficient to notify the trial court of h[er] complaint." *Edwards v. State*, 642 S.W.3d 7, 21 (Tex. App.—Beaumont 2021, pet. ref'd) (citing *Cooks v. State*, 844 S.W.2d 697, 727 (Tex. Crim. App. 1992)); Tex. R. App. P. 33.1(a).

Even had Tina preserved error on this issue, we would not reverse her convictions because the Texas Code of Criminal Procedure requires the trial court to instruct the jury about parole law. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 4(a). The trial court accordingly instructed the jury, in both cases, stating:

> The length of time for which a defendant is imprisoned may be reduced by the award of parole.
>
> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, she will not become eligible for parole until the actual time served equals one-half of the sentence imposed or thirty years, whichever is less. Eligibility for parole does not guarantee that parole will be granted.
>
> It cannot accurately be predicted how the parole law might be applied to this defendant if she is sentenced to a term of imprisonment, because the application of that law will depend on decisions made by parole authorities.
>
> You may consider the existence of the parole law. You are not to consider the manner in which the parole law may be applied to this particular defendant.

*See id.*

In making the challenged argument, the State accurately restated the law as given in the charge and asked the jury to consider that law when assessing

punishment. Neither of those actions is improper. *See Hawkins v. State*, 135 S.W.3d 72, 84 (Tex. Crim. App. 2004). Since the State argued only that Tina could be released on parole after serving half her sentence, and did not represent to the jury that Tina would be released at that time, the State did not urge the jury to "'consider the manner in which the parole law may be applied to this particular defendant.'" Tex. Code Crim. Proc. Ann. art. 37.07, § 4(a). The State therefore did not make an improper jury argument, and we overrule Tina's fifth issue as to both cases.

## CONCLUSION

Having overruled all of Tina's issues in these appeals, we affirm the trial court's judgments in trial court cause numbers F22-40200 and F22-40201.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on November 12, 2025
Opinion Delivered December 10, 2025
Do Not Publish

Before Golemon, C.J., Wright and Chambers, JJ.